## Webber Estate

456

*Snyder, Balmer & Kershner*, for accountant.

*Ellis Brodstein*, for Commonwealth of Pennsylvania, Department of Public Assistance.

*Bertram J. Murphy* and *Stevens & Lee*, for claimants and sundry heirs.

*Body, Muth, Rhoda & Stoudt*, and *Raymond H. Immig*, for sundry heirs.

MARX, P. J., April 14, 1951.—This is the account of Robert J. Rudd, trustee by appointment of this court, in the matter of the partition of real estate late of Annie R. M. Webber, deceased.

Annie R. M. Webber died on August 6, 1948, intestate and unmarried. Letters of administration on her estate were issued on August 14, 1948, to Robert J. Rudd. The administrator caused an inventory and appraisement of the assets of the estate to be filed on June 1, 1949. The appraisement aggregated the sum of $33,901.67. The administrator filed his first and final account on July 26, 1949. An adjudication on that account was filed and confirmed nisi on September 24, 1949. No exceptions to the adjudication and decree of distribution were filed, but the auditing judge, in correcting a mathematical error, filed an amendment to the adjudication on September 29, 1949. Under the audit there was found a balance for distribution of $22,086.76, subsequently found to be $21,986.77, and amended accordingly. The auditing judge, in his adjudication, found that the next of kin of decedent, entitled to participate in the distribution of the residue of the estate, were 21 first cousins of decedent, that

all are of full age and none under legal disabilities. Distribution was decreed, in 21 equal shares, to and among those included in the class.

On March 3, 1950, Katie G. (C.) Reichert et al., heirs and next of kin of decedent, presented their petition to this court asking a citation, directed to all parties in interest, to show cause why an inquest in partition of the real estate of decedent should not be awarded. The petition averred that decedent died possessed of six purparts of real estate, within the County of Berks. The citation awarded, on the return thereof, was made absolute, and a writ of partition issued. On May 31, 1950, the return of the inquest was filed and confirmed and a rule was thereupon granted, directed to all known parties in interest, directing them to appear, to accept at the appraised value, bid more, or show cause why the purparts should not be sold by a trustee. That rule was made returnable to June 28, 1950, was duly served upon all known parties in interest, and proof of service was filed on June 12, 1950. On the return day of the rule, June 28, 1950, parties in interest appeared in open court and, having been called, purparts 1, 2, 5, 6, as described, were awarded to Marie Rudd at $3,250, $4,000, $4,500 and $2,750, respectively; purpart No. 3 was awarded to Paul C. Mayer, at $5,800, and purpart No. 4 was awarded to Emma E. Mayer, at $7,250. The awards and allotments so made were confirmed by the court, conditioned upon payment of the respective sums to Robert J. Rudd, this accountant, trustee, within 60 days.

On September 30, 1950, the trustee filed and submitted for audit this account.

The accountant charges himself with the sum of $27,550, the aggregate of the considerations of the awards. The account shows a balance due the estate of $25,069.13.

. The account also includes income from real estate, from September 1948, aggregating a total of $2,948.11, and shows a balance due the estate of $1,304.13.

At the audit the accountant submitted an additional charge of $8, a refund received from the register of wills on the credit taken for filing the account.

The accountant asks and was allowed three additional credits against principal account in the respective sums of $5.20, $4.25 and $2.50, a total of $11.95.

The accountant submitted an additional charge of $2.30 on income account, a refund on a premium for liability insurance.

As amended, we now find a principal balance due the estate of $25,065.18 and an income balance due the estate of $1,306.43.

The accountant reports having made advance distributions to Emma E. Mayer, Stella Mayer, Paul C. Mayer and Marie Rudd, in the sum of $1,200 each, in partial satisfaction of the respective sums distributable to them under this audit. The receipts of those distributees, marked exhibits H, I, J and K, are appended hereto and made part of this record. To the extent of those distributions, the awards under this adjudication will be marked to the use of the accountant. The details of the additional charges and additional credits against principal and income are set forth in exhibit G, appended hereto.

An award of $12 is made to the accountant to provide payment for entry of satisfactions of awards, and an award of $25 is made to the clerk of this court to cover costs of adjudication.

The written assignment of interest of William E. Hartman to the Commonwealth of Pennsylvania, Department of Public Assistance, covers the distributive interest of the assignor, William E. Hartman, in consideration and reimbursement of the assignee for as-

sistance rendered and given by the assignee to the assignor. The assignment bears date of November 10, 1949. Under the assignment the Department of Public Assistance claims $1,528.50. Judgment against the assignor, William E. Hartman, was entered to December term, 1949, J. D., no. 127, on December 13, 1949, in the sum of $1,528.50.

A claim was made by Bertram J. Murphy, Esq., and Stevens & Lee, Esqs., against the distributive interests of 15 of the 21 first cousins of decedent, viz: Verna F. Tripp Wilson, William H. Rader, Homer A. Rader, Della R. Paulen, William E. Hartman, Albert W. Hartman, Lilian May Horton, Rachel S. Long, Ray A. Hartman, Roy D. Ziegler, Viola Z Forster, John H. Ziegler, Lyman F. Ziegler, Myrtle Z. Curtis and Maude Z. Morris. The claims are based upon the representation of the parties in interest under individual written contracts, executed and delivered by them to claimants, on the respective dates in the agreements set forth, providing in similar terms, as follows:

"The undersigned parties authorize and empower and employ Bertram J. Murphy and Stevens and Lee, as their attorneys, to collect or settle the claims which they have as heirs of the Estate of Anna R. M. Webber, late of the City of Reading, Pennsylvania, deceased.

"And the said attorneys on their part hereby agree to exercise due diligence and effort to collect said claims to the satisfaction of the undersigned parties. And the undersigned parties agree to pay the said attorneys a sum equal to 35% of any settlement or distribution to them, in said estate."

The contract from which we quoted bears date December 2, 1948 and bears execution, under their respective seals, by Verna Tripp Wilson, William H. Rader, et al., and Bertram J. Murphy and Stevens and Lee. The contract is marked Exhibit A, 11/24/50

—E. C. C., and is similar to the contracts by the remaining parties. In the contract with Rachael S. Hartman Long, dated December 10, 1948 (Exhibit D), we find the additional covenant:

"And it is agreed that said attorneys shall receive a sum equal to 35% of any settlement or distribution to said Rachael S. Hartman Long in said estate, but it is expressly agreed that said attorneys are to receive nothing for their services if said Rachael S. Hartman Long receives no settlement or distribution in said estate, it being agreed that the employment of said attorneys is upon a purely contingent basis and the receiving of any fee by them is contingent upon said Rachael S. Hartman Long receiving by way of settlement or distribution a portion of said estate."

Six of the contracting parties, Viola Ziegler Foster, John H. Ziegler, Maude Ziegler Morris, Myrtle Ziegler Curtis, Lyman F. Ziegler and Roy D. Ziegler, appeared at the audit and objected to the claims made and the award of any portion of their respective distributions, to claimants, on the contention that the contracts did not apply to the proceeds of real estate of decedent, and, if applicable thereto, should not be enforced to the extent of 35 percent of the amounts realized, and that claimants had no charge liens against the distributive shares.

An examination of the record in the case discloses the following pertinent facts:

Decedent died on August 6, 1948. Letters of administration were issued on August 14, 1948. Thereafter, on October 28, 1948, Robert J. Rudd reported that he went to the former residence of decedent and that, while cleaning, found "a small piece of white paper which he picked up and read. He immediately called upon George B. Balmer and brought the white paper to the office of George B. Balmer. . . . The place

where he lifted up the rug was within two feet of where he had originally found Mrs. Webber." That white paper contained the following writing:

"My Will
Emma Mayer and Sisters Stella and Marie each 1/3 share my estate

Anna R. Webber
8/6/48"

On November 15, 1948, counsel for the administrator presented his petition averring the discovery of the aforesaid writing and asked revocation of the letters of administration theretofore granted to Robert J. Rudd and the admission to probate of said writing and the grant of letters of administration c. t. a., to the administrator. A citation issued. On December 20, 1948, an answer thereto was filed on behalf of Verna Tripp Wilson et al., the next of kin and heirs of decedent. They denied that the writing found, alleged to be the will of decedent, was her will; denied that it was written by decedent, or signed by her. They asked that the application for probate and grant of letters of administration c. t. a. be dismissed.

On December 28, 1948, claimants, Bertram J. Murphy and Stevens & Lee, in behalf of those whom they represented, filed a caveat against the probate of the alleged will. Their bond was duly approved and accepted by the register of wills. On April 8, 1949, proponents of the alleged will withdrew their petition and asked the discharge of the citation granted thereon.

The administration of the estate then proceeded under the letters of administration originally granted, and in due course the administrator's account was filed and audited, and distribution was made under the adjudication and decree of this court.

Decedent died possessed of six separate purparts of real estate. Negotiations among and between the

parties in interest under intestate law ensued, with the intent and for the purpose of joining of all parties in interest in a deed conveying title to the real estate to J. Victor Grim, for the purpose of sale of the purparts and distribution and division of the proceeds of such sales among the parties entitled thereto, without resorting to proceedings in partition, or otherwise according to law. We find that the deed prepared was circulated and submitted over the signatures of Bertram J. Murphy, and Charles H. Weidner and John D. Glass, of the firm of Stevens & Lee. After lengthy and numerous communications it was found that not all parties in interest gave assent to the plan, and the deed was not delivered. On March 3, 1950, the petition of Katie G. Reichert et al. was presented by counsel for the administrator, in behalf of petitioners, asking the award of a citation upon all parties in interest to show cause, if any, why a writ of partition should not be entered. The writ of partition issued, the inquest reported against the possibility of partition and returned values of the respective purparts. After further necessary proceedings parties in interest appeared in court, severally elected to accept the real estate at the appraised values thereof, and the court thereupon confirmed the allotments and decreed payment to this accountant, trustee.

The contract between claimants and those whom they served is purely and essentially a contract of employment with a stipulation of compensation to be paid. The service to be rendered pertained to the recognition and settlement of the rights of the client as an heir or of the kin of Anna R. M. Webber, deceased. The attorneys agreed to accept, and the clients agreed to pay, "a sum equal to 35% of any settlement or distribution to them in said estate."

The contract with Rachael S. Hartman Long (exhibit D) includes the limitation: "it being agreed that

the employment of said attorneys is upon a purely contingent basis and the receiving of any fee by them is contingent upon said Rachael S. Hartman Long receiving by way of settlement or distribution a portion of said estate."

We find that the intent of the contracting parties included provision for payment of a stipulated percentage of the amount recovered, upon recovery, with the added limitation that no compensation be paid in the event of failure to collect, i. e., all the contracts were "contingent contracts".

"That an attorney may make any contract he sees proper with his client in regard to his compensation, where the client is a private citizen, and acting in his own behalf and with reference to his own property, is not denied. All that the law will do in such case is to scrutinize the transaction and see that it is fair and that no unconscionable advantage has been taken either of the necessities or the ignorance of the client": County of Chester v. Barber et al., 97 Pa. 455, 463.

"Agreements fairly made between counsel and clients are as obligatory as between other parties; and when a desperate claim has been successfully asserted by counsel on the faith of an agreement that one-half of the recovery shall reward his skill and diligence, it is an ungracious plea to urge that the agreement was without consideration and void": Strohecker v. Hoffman, 19 Pa. 223, 227.

"Contingent fees are not illegal. They enable some just claims to be recovered which the circumstances of the parties would otherwise defeat, while on the other hand they certainly tend to encourage litigation of a speculative and unfounded character, which is against the true interests of society. But, wisely or unwisely, a point on which opinions may fairly differ, the law has long been settled that contracts for such fees are lawful and enforceable by the courts, and something more

than the mere contingency of the compensation is necessary to make them champertous": Williams v. Philadelphia, 208 Pa. 282, 288; Klauder v. Cregar et al., 327 Pa. 1, 4.

It must be borne in mind that the initial services to the clients under these contracts were the services rendered in the grant of letters of administration in the settlement of the estate and the litigation rendered in the support of those letters and against the probate of an alleged will, which, if admitted to probate, would have limited the inheritance to three sisters, Emma and Stella Mayer and Marie Rudd, to the exclusion of all others of the same degree of kinship. The probate was defeated; the account of the administrator was audited and adjudicated and the residue of the estate was awarded, in equal shares, to 21 first cousins of the decedent. Further proceedings were required in connection with the disposition of the real estate of decedent. There were six purparts. An endeavor was made to have all parties in interest join in a straw conveyance and a division of the net proceeds of sales in accordance with the established schedule of rights as determined in the aforesaid adjudication. Here counsel prepared and submitted for execution a single deed. The majority of the parties in interest executed the deed and consented to delivery. Because of a refusal or failure of a necessary party or parties to join in that act, that plan met with defeat. Thereupon, proceedings in this court, in the partition of the real estate of decedent, were undertaken. These proceedings were followed through and the several purparts were accepted by parties in interest, at the appraised valuation, or in excess thereof. The proceeds were paid to the trustee under the appointment of this court. He filed his account. The account is now before us for adjudication and the balance for distribution.

The charge was made that the compensation provided by the agreements was excessive. In the light of the services rendered, as here recited, the complainants failed to maintain the contention. A fund had been created, and the charges are not excessive.

None of the participants sought to have their contracts with claimants vacated by direct proceedings. The contracts stand; there is no evidence of excessive charges, no sufficient ground proposed for setting aside the agreements. Claimants are entitled to recovery of the amounts sought.

Claimants desire computation of the respective sums due and an award to them, against the respective distributive shares of their clients, on the contracted basis of 35 percent of the sums recovered. In respect to this element of their claims we read, in 93 A. L. R. 682:

"In some jurisdictions it has been held that, where parties have contracted that an attorney shall have a specified amount of the recovery as compensation for his services, the agreement entitles the attorney to an equitable lien on, or interest in, property recovered, independently of any statute relative to attorneys' liens."

The contracts did not provide for liens on or assignments of the funds recovered, and there is no statute granting a so-called "charge lien" in this Commonwealth. The Act of May 6, 1915, P. L. 261, gave an attorney of record a lien for his compensation upon his client's cause of action and authorized the court to determine and enforce the lien. The act was declared unconstitutional in the case of Laplacca v. Philadelphia Rapid Transit Co., 68 Pa. Superior Court 208, affirmed in 265 Pa. 304.

"Attorneys' liens are divided according to their nature into two classes, viz., general, possessory, or retaining liens, and charging or special liens. . . . The

general, possessory, or retaining lien attaches to all papers, books, documents, securities, and money that come to the attorney professionally, or in the course of his professional employment, without any special contract in regard to it": 2 R. C. L. 1063. "Possession is essential to the creation and existence of the retaining lien, and therefore it does not attach to anything not in the attorney's hands, and, having attached, it expires when the attorney parts with the possession": Id. 1065. "In addition to the retaining lien . . . an attorney has what is generally known as a particular, special, or charging lien on the judgment, decree or award obtained for his client, for his services rendered in procuring it . . . This right, though called a lien, rests, not on possession, . . . but on the equity of an attorney to be paid his fees and disbursements out of the judgment which he has obtained, and is upheld on the theory that his service and skill produced the judgment, and in accordance with the principle which gives a mechanic a lien upon a valuable thing which, by his skill and labor, he has produced": Id. 1069, 1070.

In the case of Harris' Appeal and Jacoby's Appeal, 323 Pa. 124, speaking through Mr. Justice Maxey, the Supreme Court proposed the question:

"Has the attorney for the owner of real estate taken in condemnation proceedings any claim upon the award of compensation therefor, for the reasonable value of his services and costs of litigation, as against the mortgagee of the property?"

In answer the court said, page 128:

"Appellants do not contend that Jacoby has an ordinary common law or *retaining* lien upon the fund which the city is now prepared to pay, and which has been substituted for the condemned land. Such a lien is dependent upon possession by the attorney and binds only money, papers or other property in his hands . . .

On the other hand, the right of an attorney to a *charging* lien upon a fund in court or otherwise applicable for distribution on equitable principles, which his services primarily aided in producing and to which, by agreement with his client, he is to look for compensation, has long been recognized by the authorities. In Patten v. Wilson, 34 Pa. 299, where counsel for a judgment creditor was held entitled to the whole amount of the judgment as against his client's attaching creditor, this court referred to the right as an 'equitable assignment'. In McKelvy's and Sterrett's Appeals, 108 Pa. 615, the attorney was termed the 'equitable owner', to the extent of the value of his services, of the fund in court produced by his efforts. In that case this court said at page 620: 'The fact is found by the auditor and the court that the appellee was to look to this fund for his compensation. Its existence is due in great measure to his professional services. To the extent of the value of those services, then, the fund belonged to him; that is to say, he was the equitable owner thereof to the amount of his fee.' "

Reversing the decree of the court below, it was held (page 139) that appellant "was entitled to have the court below enter an order directing payment to him of his reasonable counsel fees and expenses of litigation."

Reference is made to Purman Estate, 358 Pa. 187, where the Supreme Court summarizes, page 192:

"Here the record is devoid of any proof that the appellants either *created* a fund for distribution or successfully *defended* the estate from depletion because of unjust claims. There is no basis for decreeing a *charging* lien against this distributive share."

In that case, as here, application was made by attorneys representing individual distributees, for payment out of distributive shares. Here the claiming attorneys, representing 15 of the 21 distributees, seek

distribution out of the 15 distributive shares, on the theory that, through their efforts and under their guidance, the probate of an alleged last will of decedent was defeated. Under the terms of that will, the entire fund for distribution would have gone to 3 of the 21 distributees, to the exclusion of the remaining 18. The contracts of claimants, with the 15 distributees represented by them, provided for payment of counsel fees, out of their respective distributions, on the basis of 35 percent of the amounts recovered. The contracts called for recoveries out of the estate of decedent, the personal and the real estates.

Under the cited cases, we conclude that claimants are entitled to payment and, furthermore, entitled to distribution, out of the respective distributive shares of their clients, under the decree of this court. . . .

And now, April 14, 1951, this adjudication is confirmed nisi; and in the absence of exceptions, filed within 10 days herefrom, such confirmation shall become absolute, as of course.